pPLOTKIN, J.,
concurring.
I write separately on the hearsay issues because of the general misuse and misunderstanding of the “fruits of the investigation” exception.

ASSIGNMENT OF ERROR NO. 2, 6, and 9

Defendant claims that the trial court committed multiple continuous legal errors throughout the trial regarding hearsay. Specifically, the trial judge overruled the defendant’s objections, during opening statement, trial and closing argument when it allowed the prosecutor and the police officers to tell the jury hearsay statements made by the defendant’s wife, Traleya Smith, and his mother in law, Linda Reeves, neither of whom testified at trial.
A. Opening Statement
Louisiana has codified the scope of opening statements and evidence referrals in *391 opening statements in La.C.Cr.P. arts. 767 and 764. Article 767 states “the state shall not, in the opening statement, advert in any way to a confession or inculpatory statement made by the defendant unless the statement has been previously ruled admissible in the case.” Article 769 says “evidence not fairly within the scope of the opening statement of the state shall not be admitted in evidence.”
|2The objected to opening statement comment of the prosecutor occurred when he was referring to the getaway vehicle involved, and to defendant’s mother-in-law and wife and stated the following:
Lo and behold, guess who that red car had been rented out by? This head-busting bandit’s wife’s mother. But you know what happened when they talked to his wife? Detective Lawless is going to tell you, she lied and she lied and she lied.
The defendant argues that the prosecutor was in bad faith in referring to the hearsay in his opening statement because he knew defendant’s wife would not testify, and that in fact the State had charged her as an accessory after the fact for concealing defendant before his arrest. She did not testify.
The La.C.E. art. 607 defines who, when and how credibility may be attacked. Article 607 states:
A. Who may attack credibility. The credibility of a witness may be attacked by any party, including the party calling him.
B. Time for attacking and supporting credibility. The credibility of a witness may not be attacked until the witness has been sworn, and the credibility of a witness may not be supported unless it has been attacked. However, a party may question any witness as to his relationship to the parties, interest in the lawsuit, or capacity to perceive or to recollect.
C. Attacking credibility intrinsically. Except as otherwise provided by legislation, a party, to attack the credibility of a witness, may examine him concerning any matter having a reasonable tendency to disprove the truthfulness or accuracy of his testimony.
D. Attacking credibility extrinsically. Except as otherwise provided by legislation:
(1) Extrinsic evidence to show a witness’ bias, interest, corruption, or defect of capacity is admissible to attack the credibility of the witness.
(2) Other extrinsic evidence, including prior inconsistent statements and evidence contradicting the witness’ testimony, is admissible when offered solely to attack the credibility of a witness unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice.
| sIn Louisiana credibility means the witness’ objective and subjective truthfulness, as well as his/her capacity, accuracy of perception and any other factor which influences his/her trustworthiness. The two most common methods of attacking credibility include questioning of the witness concerning prior inconsistent statements and bias. Evidence of proving prior inconsistent statements, bias or interest is admissible provided: (1) It is subject to the relevancy balance of La.C.E. art. 403, (2) the proper foundation is presented, and (3) it is timely under Article 607(B).
The credibility of any witness may be impeached except where the code limits the impeachment. Paragraph A of Article 607 regulates who may actually impeach the credibility of a witness and more par *392 ticularly, whether or not the party who called the witness to testify may attack the witness’ credibility. Thus even the party, calling a witness may impeach the witness’ credibility by any legal means available. However, a party must call a witness to testify before he or she can attack credibility. The Code recognizes this problem in Paragraph (a) of the Comments to Article 607, when it discusses the possibility that a party may call a witness “... primarily with the intention or effect of adducing otherwise inadmissible evidence, typically a prior inconsistent statement, on the pretext of attacking credibility.” The prior inconsistent statement is excluded from the hearsay rule under Article 801(l)(a) but only if the witness testifies and the prior statement is consistent with his present testimony.
La.C.E. art. 607(B) describes the time when a party may attempt to impeach or support the credibility of a witness. The requirement in the first sentence, of calling and swearing the witness, before attacking credibility, is designed to prohibit a party from attacking credibility of a witness before he/she is called to testify. Thus, it is improper to attack a witness’ credibility before a witness | ¿testifies. In the instant case, it was a direct attack on the defendant’s wife, accusing her of being a prevaricator for the benefit of her husband and indirectly cast a negative credibility against the defendant. The statement violated La.C.E. art. 607.
Furthermore, the purpose of this opening statement was to create the impression, in the minds of the jurors, that neither the defendant nor his wife were credible. The general rule is that whatever is said in the opening statement must be proven during trial. The scope of a criminal opening statement is limited to the nature of the charges and “in general terms the nature of the evidence by which the State expects to prove the charge.” La.C.Cr.P. Article 766. To accuse defendant’s wife of lying in the opening statement is beyond the permitted scope of an opening statement and should have been excluded by the court.
I would hold that the prosecutor comments were made in bad faith. The prosecutor knew, or should have known, when the opening statement was made, which witnesses were going to be called by the State. Traleya Smith was charged as an accessory to the crime and had a spousal privilege. “In a criminal case or in commitment or interdiction proceedings, a witness spouse has a privilege not to testify against the other spouse. This privilege terminates upon the annulment of the marriage, legal separation, or divorce of the spouses.” La.C.E. Art. 505. She did not testify nor did her mother, Linda Reeves, who has a long history of mental illness. Thus, the prosecutor knew that the statements made by Detectives Lawless and Bowman would be inadmissible hearsay. The opening statement was prejudicial to the defendant. State v. Gray, 542 So.2d 684 (La.App. 4 Cir.1989).
B. Trial Hearsay
The trial judge overruled most of the trial hearsay objections on the ground that the testimony was admissible as the “fruit of the investigation.” The Louisiana Code of Evidence does not recognize this as a formal hearsay exception. However, |fitrial judges and appellate courts in criminal cases allow police officers to testify generally about the leads and procedures utilized by investigators in order to justify their subsequent conduct and course of the investigation. The jurisprudentially created exception does not authorize the admissibility of hearsay. In State v. Broadway, 96-2659, pp. 8-9 (La.10/19/99), 753 So.2d 801, 809, cert. denied, Broadway v. Louisi *393 ana, 529 U.S. 1056, 120 S.Ct. 1562, 146 L.Ed.2d 466 (2000), the court commented on what the trial court in the instant case characterized as the “fruit” of officers’ investigations, stating:
Information about the course of a police investigation is not relevant to any essential elements of the charged crime, but such information may be useful to the prosecutor in “drawing the full picture” for the jury. However, the fact that an officer acted on information obtained during the investigation may not be used as an indirect method of bringing before the jury the substance of the out-of-court assertions of the defendant’s guilt that would otherwise be barred by the hearsay rule. State v. Wille, 559 So.2d 1321, 1331 (La.1990); State v. Hearold, 603 So.2d 731, 737 (La.1992). As this Court emphasized in Hearold, 603 So.2d at 737.
Absent some unique circumstances in which the explanation of purpose is probative evidence of a contested fact, such hearsay evidence should not be admitted under an “explanation” exception. The probative value of the mere fact that an out-of-court declaration was made is generally outweighed greatly by the likelihood that the jury will consider the statement for the truth of the matter asserted.
The prosecutor has some latitude to present a full picture because the jury may “penalize the party who disappoints them by drawing a negative inference against that party.” Old Chief v. United States, 519 U.S. 172, 117 S.Ct. 644, 654, 136 L.Ed.2d 574 (1997). Reasonable jurors may expect to learn that the police did not arrest the defendant out of thin air, but as the result of a thorough professional investigation.
96-2659, pp. 8-9, 753 So.2d at 809.
The first of many hearsay objections during the testimony of Det. Lawless came after he was asked what a neighbor, Mr. Sampson, had reported to him during an interview conducted the day after the murder. The following colloquy occurred:
IfiA I interviewed Mr. Sampson the next evening, the 28th. And he advised me that he was—
BY MR. WILLIAMS [counsel for defendant]:
Objection, Judge, hearsay, as to what any other person said to prove the truth of the matter asserted. It falls into no exception, Judge.
BY MR. BURNS [the prosecutor]:
It’s part of his investigation.
BY MR. SMITH [counsel for Antoine Thompson]:
And, Judge, note our objection also. How can we ever cross-examine this man if he never comes to court? That’s classic hearsay. It’s not res gestae.
BY THE COURT:
Overruled. It’s part of his investigation. I’m going to let him talk about his investigation and the fruit of his investigation.
DIRECT EXAMINATION RESUMED BY MR. BURNS:
Q And what happened with your investigation concerning Mr. Sampson? Were you provided with any corroborating information?
A Yes, Mr. Sampson stated that he was in his bed asleep and he heard gunshots. He ran, checked on his kids to make sure they were okay and then looked out the window across the street towards 1802 and 1804 Music Street. At that time he observed—
BY MR. WILLIAMS:
Judge, the defense is going to object again. Lonnie Alen will not be *394 able to confront his accusers if this witness is allowed to testify to what someone said out of court, Judge.
BY THE COURT:
Overruled.
DIRECT EXAMINATION RESUMED BY MR. BURNS:
A At that time he stated that when looked out the window, he observed three black men standing on the sidewalk facing 1802, 1804 Music Street pointing guns at the men that [sic] was on the porch. He stated that he observed one subject had one gun and the other two subjects had one gun in each hand. He later stated that he could not identify anybody because from where he was positioned all he could see was the silhouettes of three men.[1]
Q And continue, You were talking about the car, sitting on the car.
|7A Okay, Detective Franklin, he was sitting on the car in the 2100 block of Desire Street. When Miss Traleya Smith got in the car to pull off, he stopped the car. And he contacted the sergeant, Sergeant A1 Bowman. Sergeant A1 Bowman proceeded to the scene and he contacted me via radio and he advised me that he had the car stopped and that the right tail light was out.
BY MR. WILLIAMS:
Objection, Judge, to hearsay as'to what other police officers are now telling this witness.
BY THE COURT:
Overruled. We’re still dealing with the fruit of his investigation.
DIRECT EXAMINATION RESUMED BY MR. BURNS:
A After being informed by Sergeant Bowman that the vehicle had been stopped, the vehicle was transported to New Orleans 5th District station, along with Miss Traleya Smith who was being brought over for questioning. After the car was transported to the 5th District station, Mr. Davis was contacted by one of the detectives and he came to the station and he identified the vehicle.
Q Detective, what happened when you conducted your interview with Miss Smith? Were you able to learn any information about the red car?
A Yes, Miss Smith stated that—
BY MR. CHANEY [second counsel for defendant]:
Objection, Your Honor, to the hearsay testimony by Miss Smith. The same objection, Your Honor, regarding hearsay statements of a witness and the right of confrontation of the witness. And there’s a continuing objection as to statements or hearsay statements made to this—
BY THE COURT:
Let me state this right now... [The trial court instructs counsel that only one attorney per defendant will be permitted to lodge objections per witness. And counsel agree who will be handling Det. Lawless],
[[Image here]]
(THE FOLLOWING TAKES PLACE AT SIDE BAR)
BY MR. CHANEY:
Judge, with respect to the witness Traleya Smith or the detective’s statements regarding information gathered from the witness Traleya Smith, we are going to assert that that testimony *395 is further barred by the marital privilege[sic] She is the wife of Lonnie Allen. Basically the information she provided to the police officers was gotten in violation of the marital privilege. And that | ¿further bars him from making any statement regarding information he gathered from Traleya Smith.
BY THE COURT:
Overruled. That again falls within the fruit of his investigation.
(THE TRIAL IS RESUMED IN OPEN COURT)
DIRECT EXAMINATION RESUMED BY MR. BURNS:
Q And again, Detective, what information did you learn from Miss Smith?
A Initially, I learned from Miss Smith that Lonnie Allen was her ex-boyfriend and that they had broken up. And that they were at one time living at 6122 Music Street, but she had put him out. And that she was the primary driver of the car and that her mother had rented the car for her use. After interviewing Miss Linda Reeves, who actually rented the car—
Q How did you find that information out, Detective?
A From Traleya smith.
Q Continue.
A After learning that Miss Reeves had rented the car for Traleya, Miss Reeves was contacted and requested to come into the station, you know, and talk to us. At that time it was learned that Traleya Smith was actually married to—
BY MR. CHANEY:
Objection, Your Honor, regarding any information gathered from Miss Reeves. That’s hearsay testimony. Miss Reeves will not be produced by the state as a witness in this trial.
BY THE COURT:
I’m not sure of that, but I’m still overruling it based on Detective Lawless conveying the fruit of his investigation.
BY MR. CHANEY:
Note our continuing objection for the record, Your Honor.
BY THE COURT:
It’s noted.
DIRECT EXAMINATION RESUMED BY MR. BURNS:
Detective, before you begin, I want to show you what I’ve marked as State’s exhibit Number 25 and ask you to identify it?
[Det. Lawless identifies Miss Reeves’ lease agreement for a red, two-door Pontiac Sunfire, as well as a photograph of the vehicle, with an objection by defendant as to witness describing the photo being overruled],
JbL * * *
DIRECT EXAMINATION RESUMED BY MR. BURNS:
X X *
Q And continue with what happened when you spoke with Miss Linda Reeves, Detective?
A Well, while speaking to Miss Reeves, I learned that Traleya Smith was actually married to Lonnie Allen. And that they actually lived together at 6122 Music Street. And Lonnie Allen actually had keys to the residence even though initially I was told he didn’t have keys and that he was not there and that they didn’t know where he was. And it was also brought out that the car was rented for Traleya but that Lonnie Allen used the car the bulk of the time and would drop Traleya off by [sic] her mother’s house.
*396 Q Detective, at any point did you bring these ladies together?
A Yes, I did.
Q And what happened then?
A When I brought them together, that’s when Traleya Smith admitted that she was really married to Lonnie Allen, that Lonnie actually used the car the majority of the time, that he had the car on the night of the incident and that he had dropped her off by [sic] her mother’s house on Desire Street. And that she actually lived at 6122 Music and not at the 2129 Desire Street that she originally stated that she lived with her mother. And it was also brought out that after the incident Traleya tried to get her mother to trade the car in claiming that it had some type of mechanical difficulty.
BY MR. CHANEY:
Objection, Your Honor, to double hearsay regarding statements made by Traleya to her mother.
BY THE COURT:
No, I’m still dealing with this as the fruit of Detective Carlton’s investigation.
DIRECT EXAMINATION RESUMED BY MR. BURNS:
A And that Lonnie did not use the car after that incident.
More hearsay objections were lodged during the direct examination of State witness Sergeant A1 Bowman, as he was testifying about locating and stopping the red Pontiac Sunfire allegedly used by defendant as a getaway car on the night of the murder:
DIRECT EXAMINATION BY MR. EVANS:
[[Image here]]
ImQ We followed the vehicle for a short distance where we ended up stopping it, doing a traffic stop. By the time I got on the scene, they had already extricated this female from the vehicle and identified her as a Traleya Smith, who was operating the vehicle at the time. We asked her if she was the owner of the vehicle. She advised that—
BY MR. WILLIAMS [counsel for defendant]:
Objection, Judge, to hearsay to any out-of-court person testifying.
BY THE COURT:
No, he’s dealing with his investigation.
BY MR. WILLIAMS:
Judge, for the record, I would just like to know what exception to the hearsay rule this would fall under?
BY THE COURT:
We’re dealing with the fruits of his investigation.
DIRECT EXAMINATION RESUMED BY MR. EVANS:
Q Please proceed officer.
A Anyway, we ascertained that the vehicle was a rental vehicle rented by this female’s mother. In questioning her, we asked her if anybody else had the occasion to drive this vehicle. And she said that, yes, her boyfriend at the time, Lonnie Allen.
BY MR. WILLIAMS:
Objection, Judge, to has to hearsay. BY THE COURT:
Overruled.
DIRECT EXAMINATION RSUMED BY MR. EVANS:
A After receiving this information on the parties, I went to the vehicle, turned on the lights and confirmed for myself that the right rear tail light of this vehicle was in fact out, not operable. Based on this information and the information this young lady provided to us at the *397 time, I had the vehicle impounded for further investigation and to be checked for any forensic evidence that we might be able to recover out of this vehicle in the event it was the vehicle that we were looking for.
We took this young lady up to our office where we were to get a statement from her as to who rented the vehicle for her, who had access to this vehicle. Initially, she was very evasive, didn’t give us a lot of information. When I found out that the vehicle was actually rented by her mother, we contacted her and asked her to come into the office to assist us with this investigation with the questioning, which she did.
Shortly thereafter, we interviewed Mss Smith’s mother. And she advised that her daughter Traleya Smith and Lonnie—
BY MR. WILLIAMS:
In Objection again, Judge, double hearsay.
BY THE COURT:
Still dealing with the fruit of his investigation.
BY MR. WILLIAMS:
It’s still hearsay, Judge. We’ll note our objection at this time to double hearsay.
DIRECT EXAMINATION RESUMED BY MR. EVANS:
A We were advised by this lady that her daughter and Mr. Lonnie Allen were in fact legally married. That she had rented that vehicle for their purposes and that he was the primary driver. We obtained a physical description of this individual. And that’s how we developed him as a suspect in this incident. And which who was subsequently positively identified through a photographic lineup.
Finally, Detective Kevin Johnson, who arrested defendant at 6122 Music Street on June 17, 1999, testified on direct examination that defendant’s wife answered the door of the residence when he knocked. Over counsel for defendant’s hearsay objection, Det. Johnson stated that Ms. Smith informed him that she had not seen defendant for about three weeks. Defendant was found hiding in the attic. The trial court overruled defense counsel’s hearsay objection, stating, “He’s talking in terms of his investigation.”
Hearsay is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. La. C.E. art. 801(C); State v. Castleberry, 98-1388, p. 18 (La.4/13/99), 758 So.2d 749, 765; State v. Raby, 98-1453, pp. 8-9 (La.App. 4 Cir. 6/2/99), 738 So.2d 699, 703. Hearsay is not admissible except as otherwise provided by the Code of Evidence or other legislation. La. C.E. art. 802; State v. Richardson, 97-1995, p. 13 (La.App. 4 Cir. 3/3/99), 729 So.2d 114, 121. Evidence is only considered hearsay if it is a “statement.” See La. C.E. art. 801(C); State v. Armstead, 432 So.2d 837, 840 (La.1983). A statement is an oral or written assertion, or nonverbal conduct of a person, if it is intended by him as an assertion. La. C.E. art. 801(A). A trial court’s rulings on the admissibility of evidence will [1?,not be overturned absent a clear abuse of discretion. State v. Mosby, 595 So.2d 1135, 1139 (La.1992).
In State v. Wille, 559 So.2d 1321 (La.1990), the court commented on the purpose of the hearsay rule, stating:
One of the primary justifications for the exclusion of hearsay is that the adversary has no opportunity to cross-examine the absent declarant to test the accuracy and completeness of the testimony. The declarant is also not under *398 oath at the time of the statement. Moreover, the confrontation clause of the United States Constitution provides that “[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him”. U.S. Const, amend. VI. There is no opportunity for confrontation when an assertion by one party is presented through the testimony of another party.
The relationship between the confrontation clause and hearsay evidence was discussed in California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). The Court recognized that the reasons for excluding hearsay assertions were (1) to insure that the witness will make his assertions under oath, thus impressing him with the seriousness of the matter and subjecting untrue statements to a penalty for perjury; (2) to force the witness to submit to cross-examination, characterized as the “greatest legal engine ever invented for the discovery of truth”; (3) to permit the jury which decides the defendant’s fate to observe the demeanor of the witness in making his statements, thus aiding the jury in assessing the witness’ credibility. Id. at 158, 90 S.Ct. at 1935.
[[Image here]]
Admission of information received by a police officer in the investigation of a crime, on the basis that such information explains the officer’s presence and conduct and therefore does not constitute hearsay evidence, is an area of widespread abuse. McCormick on Evidence § 249 (E. Cleary 3d ed.1984). Such information frequently has an impermissible hearsay aspect as well as a permissible nonhearsay aspect, and the court in determining admissibility should balance the need of the evidence for the proper purpose against the danger of improper use of the evidence by the jury. Id. The fact that an officer acted on information received in an out-of-court assertion may be relevant to explain his conduct, but this fact should not become a passkey to bring before the jury the substance of the out-of-court information that would otherwise be barred by the hearsay rule. G. Pugh, Louisiana Evidence Law 429-431 (1974).
When an out-of-court statement, such as information received by a police officer during an investigation of a crime, has both an impermissible hearsay aspect and a permissible nonhearsay aspect, the issue of relevancy becomes significantly interrelated with the hearsay issue. If the nonhearsay content of the statement has little or no Irrelevance, then the statement should generally be excluded on both relevance and hearsay grounds. Marginally relevant nonhear-say evidence should not be used as a vehicle to permit the introduction of highly relevant and highly prejudicial hearsay evidence which consists of the substance of an out-of-court assertion that was not made under oath and is not subject to cross-examination at trial, (footnotes omitted).
559 So.2d at 1329.
Through the out-of-court statements of Traleya Smith and Linda Reeves, as testified to by Det. Lawless and Sgt. Bowman, the jury learned that Traleya Smith was the daughter of Linda Reeves, who had rented the suspected getaway car; that Traleya Smith had deceived police several days after the murder by telling them that defendant had been her boyfriend, but that they had ended their relationship and he did not reside with her, when in fact they were married and residing together; that defendant had no keys to the marital abode, when he did; that she was the primary driver of rental vehicle, when in fact defendant had been the primary driv *399 er. Most importantly, the jury learned from Det. Lawless per Traleya Smith that defendant was using the vehicle on the night of the murder, after having dropped her off at her mother’s home and that Traleya Smith had asked her mother to trade in the car, claiming that it had a mechanical problem. The jury also learned from Detective Johnson that Tra-leya Smith lied to police when they came to arrest defendant, telling them that she had not seen him in three weeks, when in fact he was hiding in the attic.
Some of the out-of-court declarations may have been relevant to show the course of the investigation, and the development of defendant as a suspect, so as to permit the State to present a full picture of the police investigation. However, the probative value of the evidence for that explanatory purpose was far outweighed by the danger that the jury would accept the out-of-court declarations for the truth of the matter asserted. There can be no doubt that the statements of Traleya Smith and Linda Reeves were accepted by the jury for the truth of the matter asserted. | uConsidering these facts and circumstances, the trial court clearly abused its discretion in overruling repeated defense hearsay objections and permitting the police officers to testify to the substance of hearsay statements made to them by defendant’s wife and mother-in-law.
It is clear that Traleya Smith would never have testified against defendant. She was married to defendant, thus was able to assert a marital privilege, and had attempted to protect him through lies and misrepresentations. Ms. Reeves allegedly had mental problems, and had at some point been committed to a mental institution. It is doubtful that the State even sought to subpoena her as a witness. Absent hearsay testimony, the jury would have never learned of their inculpatory statements to police.
Nevertheless, the erroneous admission of hearsay evidence is subject to the harmless error analysis. See State v. West, 95-0411, p. 8 (La.App. 4 Cir. 1/31/96), 669 So.2d 545, 549-550, citing State v. Veals, 576 So.2d 566, 568 (La.App. 4 Cir.1991). In Veals, this court set forth the following factors to be considered in determining whether the error was harmless:
1) the importance of the witness’s testimony; 2) the cumulative nature of the testimony; 3) the existence of corroborating or contradictory evidence regarding the major points of the testimony; 4) the extent of cross-examination permitted; and 5) the overall strength of the State’s case. State v. Wille, 559 So.2d 1321, 1332 (La.1990).
576 So.2d at 568.
There was no non-hearsay evidence introduced to show that defendant had used the suspected getaway car on the night of the murder or that the vehicle had been rented by Traleya Smith’s mother, only by someone named Linda Reeves. Nor was there even any non-hearsay evidence introduced to establish that defendant was married to Traleya Smith, who was arrested driving the suspected getaway car days after the murder. Frank Oliver identified defendant in court as one of the two persons he had seen fleeing the scene in the particularly described |1Rvehicle with the malfunctioning taillight. However, as discussed above and below, Frank Oliver’s credibility as a witness was called into question.
There was no evidence to contradict the hearsay testimony, and defendant presented no evidence in his defense. Defense counsel was able to cross examine the three police officers, but wisely did not cross examine them as to the damaging out-of-court statements by defendant’s *400 wife and her mother. Thus, the hearsay testimony was not harmless because it established that Lonnie Allen had access to and drove the getaway red Pontiac car from the scene of the crime, which was rented by his mother-in-law and that his wife attempted to protect him by lying to the police officers.
There was admissible non-hearsay evidence that Traleya Smith answered the door at 6122 Music Street when police went to arrest the defendant, who was found there hiding in the attic. This established a link between defendant and the suspected getaway vehicle. Aside from the hearsay evidence, the State’s case rested on the eyewitness identification of defendant by Reginald Davis who, at one point during the robbery, was no more than two arm lengths away from the unmasked defendant. He identified defendant in a photo lineup, as well as in court, as the person who shot the victim at least once. The victim died of a single gunshot wound. Robert Spriggins, present with Reginald Davis, the victim, Tremane Andrews and Lawrence Clark, at the time of the robbery/shooting/murder, also identified defendant in a photo lineup. Mr. Spriggins and Mr. Andrews verified Mr. Davis’ testimony that Mr. Davis had handed money to the unmasked gunman who had put a gun to the victim’s head. Thus, two victim/witnesses besides Mr. Davis put the defendant in extremely close proximity to the murderer.
Frank Oliver identified defendant in court as one of the two persons he observed flee in the car, the other being Antoine Thompson, defendant’s | -mcodefendant. However, Mr. Oliver had been unable to identify defendant’s photo in the photo lineup presented to him. In addition, at the hearing on the motion to suppress the identification, Mr. Oliver misidentified defendant, who was the only defendant sitting at the defense table, as the person whose photo he had selected in a photo lineup. He had actually selected Antoine Thompson’s photo. The eyewitness identification of the defendant is, in part, ambiguous.
To determine whether an error is harmless, the proper question is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error. State v. Snyder, 98-1078, p. 15 (La.4/14/99), 750 So.2d 832, 845. The admission of the hearsay testimony, particularly of Det. Lawless and Sgt. Bowman “as fruits of the investigation” was an egregious error on the part of the trial court. Accordingly, the trial court’s error in admitting the hearsay evidence during the trial was not harmless and constitutes reversible error.
C. Closing Argument Hearsay
Appellant, further claims that three times during closing argument, the prosecutor argued to the jury the improperly admitted hearsay. The scope of closing argument “shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the State or defendant may draw therefrom, and to the law applicable to the case. The argument shall not appeal to prejudice. The State’s rebuttal shall be confined to answering the argument of the defendant.” La.C.Cr.P. art. 774. Prosecutors may not resort to personal experience or turn argument into a plebiscite on crime. State v. Williams, 96-1023, p. 15 (La.1/21/98), 708 So.2d 703, 716. However, prosecutors have wide latitude in choosing closing argument tactics. State v. Casey, 99-0023, p. 17 (La.1/26/00), 775 So.2d 1022, 1036, cert. denied, Casey v. Louisiana, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000), citing State v. Martin, *401 539 So.2d 1235, 1240 (La.1989) (closing arguments that referred to “smoke screen” tactics and defense as “commie pinkos” inarticulate but not improper). Further, the trial judge has broad discretion in controlling the scope of closing arguments. Id. Even if the prosecutor exceeds the bounds of proper argument, a reviewing court will not reverse a conviction unless “thoroughly convinced” that the argument influenced the jury and contributed to the verdict. State v. Ricard, 98-2278, p. 4 (La.App. 4 Cir. 1/19/00), 751 So.2d 393, 397, writ denied, 2000-0855 (La.12/8/00), 775 So.2d 1078. Even where the prosecutor’s statements are improper, credit should be accorded to the good sense and fair-mindedness of the jurors who have heard the evidence. Williams, supra; Ricard, supra.
The prosecutor made reference to improperly admitted hearsay statements in three instances. He first stated:
BY MR. BURNS:
His wife, she tried. But she lied and she lied and she lied.
BY MR. WILLIAMS:
Objection, Judge, she was not called by the State.
BY MR. BURNS:
But her mom got it all straightened out.
BY MR. WILLIAMS:
Objection, Judge, her mother was not called by the State.
BY THE COURT:
Mr. Williams, to begin with, it wasn’t your closing, so don’t say another word.
Next, the prosecutor stated that defendant’s mother-in-law did a good thing by talking to Det. Lawless and giving up that car. Defense counsel objected. The prosecutor reiterated that she had done a good thing. Defense counsel objected that the mother-in-law had not presented any information during the course of the trial, and moved for a mistrial.
hsLastly, the prosecutor said:
When Detective Lawless talked to her, “You did a good thing by giving him up and giving that car up.” That information was brought to you and that car was tracked down.
Defense counsel did not object to this statement.
Counsel for defendant objected timely and moved for a mistrial, which was overruled and denied. Since Linda Reeves and Traleya Smith did not testify, the prosecutor’s statements were based .on inadmissible evidence, beyond the scope of permitted closing arguments. It cannot be said that the combined effect of the opening statements and the erroneous admission of hearsay during trial and the closing arguments were harmless error beyond a reasonable doubt. The State’s theme of the case was the falsehoods, and cover-up of the ownership and use of the Pontiac automobile by the defendant and his family. The cumulative effect of these errors further warrants a reversal of the conviction and sentence, as I cannot say that they did not contribute to the guilty verdict beyond a reasonable doubt.

. It appears that some transcript testimony is missing here. Even though the transcript goes from page 70 to page 71, the Det. Lawless’ testimony abruptly shifts from one subject to another. However, defendant does not complain of any missing transcript testimony.